IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| JIMMY LEE LETTERMAN and ANNETTE FAY LETTERMAN, | ) ) ) | |
| Plaintiffs, | ) ) ) | No. 5:12-CV-06136-NKL |
| v. | ) ) | |
| WILLIAM D. BURGESS, III, | ) ) | |
| Defendants. | ) | |

**ORDER**

Following entry of a jury verdict against them [Doc. 385], Defendants Lammers, Gastineau, Farnsworth, and Earls renew their request for judgment as a matter of law, and in the alternative, they request a new trial [Doc. 394]. The motion is denied.

**I.      Background**

Danial Letterman was serving a 120-day sentence in the Missouri Department of Corrections for drug possession, and was placed at the Department's Western Reception, Diagnostic and Correctional Center for drug treatment. During his incarceration, mental health staff became concerned he would harm himself, and determined he needed to be placed on full suicide watch. Danial was placed in a padded cell in the transitional care unit (TCU) during the day on November 17, 2011, suffered a head injury in the cell, was not provided medical attention for about 16 hours, and subsequently died from his head injury. Lammers, Gastineau, Farnsworth, and Earls were custody staff responsible for supervising inmates in the padded cell at the time, but none of them obtained medical care for Danial.

When an inmate is placed on full suicide watch, the prison's close-observation policy requires custody staff to closely monitor the inmate, visually checking on him at least four times

an hour. The policy further provides, "[S]taff conducting 15-minute checks will ensure the offender is alive by movement, watching the offender's chest rise and fall as he breathes, et cetera. If an offender does not or will not move or if an offender appears not to be breathing, the control center will immediately be notified…. (A) the observation times are to be documented by staff on close observation—on the close observation log, Attachment D, along with brief notes documenting the observations." [Doc. 401, p. 51.][1] The close-observation forms, where custody staff document times of checks and make notes, are attached to the wall next to the door of the padded cell. Close-observation checks are required to be performed frequently because the risk of harm to the inmate is so great that injury could occur in less than 15 minutes. Even when an inmate who is under close observation appears to be sleeping, custody staff must still get some kind of affirmative response from him every 15 minutes. [Doc. 401, p. 108.] When an inmate is unresponsive, custody staff is trained to treat the situation as a medical emergency. Custody staff is responsible for opening a cell door; medical staff cannot do so.

Danial's parents, Plaintiffs Annette and Jimmy Letterman, sued for violation of Danial's civil rights under 42 U.S.C. § 1983 based on denial of medical care, and wrongful death under Missouri law. The Constitutional claim for denial of medical care was against Defendants Lammers, Gastineau, Farnsworth, and Earls. After a four-day jury trial, the jury found in favor of Plaintiffs on this claim, awarding $256,793.29 for actual damages ($6,793.29 for funeral and burial expenses; $100,000 for physical pain, and mental and emotional suffering experienced by Danial; and $150,000 for the nature and extent of the Constitutional injury), and $55,000 for punitive damages ($10,000 apiece against Defendants Lammers and Gastineau; $15,000 against Defendant Farnsworth; and $20,000 against Defendant Earls).

---

[1] Calling the control center when an inmate is unresponsive is sometimes referred to by custody staff as calling a "Code 16." [Doc. 401, pp. 110-11.]

Case 5:12-cv-06136-NKL   Document 408   Filed 01/13/16   Page 2 of 28

The wrongful death claim was against Lammers, Gastineau, Farnsworth, Earls, and Defendant Jennings. On this claim, the jury found in favor of Plaintiffs and against all Defendants except Jennings. The jury awarded $1,000,000 in actual damages, apportioning fault as follows: 20% apiece to Defendants Lammers and Gastineau; 25% to Defendant Farnsworth; and 35% to Defendant Earls.

## II.     Discussion

### A.     Judgment as a matter of law

Defendants argue they are entitled to judgment as a matter of law because there was not sufficient evidence to support the jury's verdict.

"Judgment as a matter of law is appropriate only when all of the evidence points one way and is susceptible of no reasonable inference sustaining the position of the nonmoving party." *Id.,* 792 F.3d at 955 (internal quotation and citation omitted). The district court views the evidence in the light most favorable to the jury verdict; does not weigh or evaluate the evidence; and does not consider credibility questions. *Am. Family Mut. Ins. Co. v. Graham*, 792 F.3d 951, 955-56 (8th Cir. 2015).

### 1.     The 1983 verdict

Plaintiffs' Eighth Amendment claim required them to prove that there was a substantial risk of serious harm to Danial, and that Defendants were deliberately indifferent to that risk of harm. *Letterman v. Does*, 789 F.3d 856, 861 (8th Cir. 2015). The deliberate indifference prong has two components: a defendant must know of and disregard "an excessive risk to inmate health or safety," and must know that his "conduct was inappropriate in light of that risk." *Id.* (quoting *Krout v. Goemmer,* 583 F.3d 557, 567 (8th Cir. 2009)). "[T]he obvious inadequacy of a response ... may support an inference that the officer recognized the inappropriateness of his

Case 5:12-cv-06136-NKL   Document 408   Filed 01/13/16   Page 3 of 28

conduct." *Krout,* 583 F.3d 557 at 567. Furthermore, "[d]eliberate indifference is … evident where prison officials erect arbitrary and burdensome procedures that 'result[] in interminable delays and outright denials of medical care to suffering inmates.'" *Monmouth County Corr. Inst. Inmates v. Lanzaro,* 834 F.2d 326, 347 (3rd Cir. 1987) (quoting *Todaro v. Ward,* 565 F.2d 48, 53 (2nd Cir. 1977)).

### a.   Defendant Lammers

Lammers, a Corrections Officer I or entry-level officer, was working the overnight shift in the TCU, which began at 10:30 p.m. on November 17, 2011 and ended the following morning at 8:30 a.m. Lammers was responsible for performing the close-observation checks during his shift. On the evening of November 17, Danial fell twice in his cell, around 11:30 p.m. and 11:45 p.m., hitting his head both times. After the second fall, Danial stayed in the same spot on the floor and never got up again. Lammers argues that he was not deliberately indifferent to Danial's serious medical need because no one asked him to access the cell and he relied on Nurse Stevens to evaluate the situation. But Lammers points to his own testimony, resolves inferences in his favor, and overlooks evidence unfavorable to him. Viewing the evidence through the lens described by the Eighth Circuit in *Graham*, 792 F.3d at 955-56, there was a legally sufficient evidentiary basis on which the jury could find for Plaintiffs.

Specifically, Lammers knew from the beginning of his 10-hour shift that Danial was on close observation status, the very nature of which indicated Danial was at high risk of injury. Lammers knew Danial fell twice that evening. The second fall, around midnight, was loud enough—notwithstanding that Danial was in a padded cell—that Lammers heard it from elsewhere in the unit, causing him to go to the monitor at the TCU desk to look at the image of Danial's cell, and then go to Danial's cell to check on him. Lammers tried to speak with Danial

4

because he believed Danial could have been injured. Danial was on the ground and did not say anything. Throughout the rest of Lammers' shift, Danial never got up, remained in a spread-eagle position against the door, and was unresponsive.

Nurse Stevens was on the same shift as Lammers. She gave Danial his medication at the beginning of the shift. She testified that Lammers never told her Danial fell, hit his head, and was unresponsive. Nurse Kesterson, who came through the unit around 6 a.m., looked in Danial's cell and spoke with Lammers and Nurse Stevens. Kesterson said the only thing he could tell was that Danial was breathing and his breathing was non-labored, and that to get any other information, he (Kesterson) would have to get in the cell and get hands on Danial.

Of particular significance, Lammers falsified the close observation logs he filled out during shift. He falsely stated he checked Danial four times an hour throughout the shift. Further, when he did actually observe Danial during the shift, he failed to note that Danial was unresponsive. At no time during Lammers' shift did he ever contact the prison's control center to open the door to get medical attention for Danial, nor did Lammers ever open the door himself, although he admitted he could have done so. Nursing staff cannot open a cell door.

Based on the foregoing, the jury could reasonably conclude Lammers knew Danial was at substantial risk of harm. Lammers knew Danial was on close observation status because he was at high risk of injury, and that he fell twice, the second time so hard that the impact could be heard outside the padded cell. The jury could also reasonably conclude Danial's need for medical attention was obvious, even to a lay-person. For example, after the second fall, Danial never got up again, and lay in an awkward, spread-eagle position against the door for the rest of the shift, which Lammers was aware of. Finally, the jury could reasonably conclude that Lammers' response was obviously inadequate, supporting the inference that Lammers

5

recognized the inappropriateness of his conduct. For example, Danial was unresponsive, and Lammers admitted that the possibility Danial was injured actually occurred to him. Nurse Kesterson said to Lammers that all he could determine by looking at Danial through the door was that Danial was breathing and his breathing was non-labored, and he (Kesterson) would have to get into the cell to determine anything else. Lammers admitted he could have opened the door. But Lammers did not, nor did he ever call a Code 16. Also, Lammers falsified his records, further evidence of culpability.

A jury could also find Lammers' purported reliance on the nursing staff to be untrue or unreasonable. *See McRaven v. Sanders,* 577 F.3d 974, 981 (8th Cir. 2009) (to avoid liability for deliberate indifference based on reliance on medical personnel, the official's reliance must be reasonable). Lammers did not provide nursing staff all the information he had.

Lammers is not entitled to judgment as a matter of law.

### b.      Defendant Gastineau

Gastineau, a Corrections Officer I who was working second shift, relieved Lammers around 8:30 a.m. on November 18, 2011, and was responsible for performing the close-observation checks on Danial during her shift. During that shift, Danial remained in the same position on the floor and was unresponsive. Gastineau argues she relied on medical personnel, none of whom told her Danial's door needed to be opened immediately. She also points out that she asked her supervisor, Farnsworth, to access the door, but was denied, and told the next person in the chain of command, Earls, that Danial had been lying in the same position for hours, but Earls did nothing to access the cell, either. Gastineau overlooks evidence unfavorable to her, and resolves inferences in her favor. Viewing the evidence in accordance with *Graham*, 792

F.3d at 955-56, there was a legally sufficient evidentiary basis on which the jury could find for Plaintiffs.

Specifically, Gastineau came on duty around 7:30 and relieved Lammers. She knew Danial was on close-observation status and had fallen during the prior shift. Danial was lying in the spread-eagle position against the door. Gastineau made rounds with Nurse Hook, initially skipping Danial's cell. Hook and Gastineau returned to Danial's cell, and Hook asked Gastineau to open the cell door so she could check Danial's vital signs, but Gastineau did not call anyone to open the door. Instead, Gastineau kicked Danial's cell door, and then banged her key against the food port and called through the slot. Danial moved his head a little and fluttered his eyes, but did not respond. Gastineau reached through the slot in the door and sprinkled water on Danial's face, something she had never done to any inmate before, and Danial still did not respond. Danial's lack of response caused her a "[a] little bit" of concern, but she did not call a Code 16 as required. [Doc. 402, p. 70.] At some point while Gastineau was kicking on the cell door and making noise with the key, Nurse Gomez, and a psychologist, Dr. Simmons, joined her and Nurse Hook in front of the cell. Gastineau did not tell anyone that Danial had fallen and hit his head the night before, nor did she share with Dr. Simmons that Nurse Hook had asked for Danial's door to be opened.

Around 10:40 a.m., Gastineau offered Danial his lunch tray, but he was still unresponsive, and did not eat. She called Farnsworth, telling him Danial had not moved since she began her shift and that a nurse wanted the cell door opened to check Danial's vital signs. Farnsworth said he did not have any officers available. Gastineau wrote in the close observation log that she was "unable to wake [Danial]" and that she had notified Sergeant Farnsworth that the cell needed to be accessed. [Doc. 402, p. 74.]

Around noon, Nurse Hook asked Gastineau a second time to access Danial's cell to check his vital signs. Gastineau tried to radio Lieutenant Earls, but Farnsworth answered the call. Earls subsequently came through the unit on routine rounds. Gastineau and Nurse Hook were standing near each other. Gastineau told Earls she needed to open Danial's cell door, she had made several attempts to get a response from Danial without success, Danial had not moved at all, and Nurse Hook needed into the cell to check Danial's vital signs. Earls said, "Let sleeping dogs lie." The cell door was not opened.

Around 2 p.m., Defendant Marcia Jennings, an acting functional unit manager, came to the TCU and saw on the monitor at the desk that Danial was lying spread-eagle on the floor, up against the door. Gastineau told her Danial had been lying in the same position all day, had not eaten anything, and had not gotten up to relieve himself.

Throughout her shift, Gastineau did not go to the cell door to check on Danial four times an hour, and she falsified the close observation logs she filled out. Gastineau admitted that she knew, at the time, that checking on an inmate in the padded cell by viewing him on the monitor, rather than going to the door of the cell, created a risk that a serious injury could be missed. [Doc. 402, p. 66.] Gastineau did not tell anyone she was failing to check on Danial and falsifying the log. Gastineau never called the control center to get medical help for Danial. [2]

Based on the foregoing, the jury could reasonably conclude Gastineau knew Danial was at substantial risk of harm. She knew Danial was on close observation status and had fallen during the prior shift. The jury could also reasonably conclude Danial's need for medical attention was obvious, even to a lay-person. For example, when Gastineau started her shift,

---

[2] A Corrections officer who came on the third shift in the TCU, Lieutenant Pelletier, called a Code 16. Danial's cell door was opened around 4 p.m. and he was taken to the hospital where he was later pronounced dead.

Danial was lying in an awkward, spread-eagle position against the door, and remained there without moving for the rest of the shift, which Gastineau knew. She knew he did not eat, and did not get up to relieve himself during her shift. She yelled at him through the slot in the slot in the door, made loud noises, and sprinkled water on his face through the slot, but he was unresponsive. Finally, the jury could reasonably conclude Gastineau knew her conduct was inappropriate.

A jury could find that any reliance Gastineau did place on the nursing staff was not reasonable, *see McRaven,* 577 F.3d at 981, because nursing staff in fact wanted the door opened to check Danial's vital signs. Even if Gastineau failed to appreciate that the situation presented an emergency, the Constitution does not require that an emergency exist before an official must obtain medical care for an inmate.

Furthermore, whether Gastineau attempted to contact her immediate supervisor, and the person above him in the chain of command, to open the door, Gastineau was not prevented from obtaining medical attention for Danial. She could have called a Code 16 by contacting the control center. Prison policy required this to be done if an inmate was unresponsive. But she did not call a Code 16.

Gastineau is not entitled to judgment as a matter of law.

c.      **Defendant Farnsworth**

Farnsworth was a Corrections Officer II, or sergeant, and was on duty November 18, 2011, on the same shift as Gastineau. He was responsible for supervising the TCU, including the padded cell. Farnsworth was contacted by phone or radio about Danial's condition, but never saw to it that the door was opened so that Danial could receive medical attention. Farnsworth argues there is no evidence that he was subjectively aware Danial needed help or had a serious

9

medical need, but Farnsworth resolves inferences in his favor, and overlooks evidence unfavorable to him.  Viewing the evidence in accordance with *Graham*, 792 F.3d at 955-56, there was a legally sufficient evidentiary basis on which the jury could find for Plaintiffs and against Farnsworth.

Specifically, Farnsworth was supervising the TCU.  He acknowledged that it is inmates who are at risk of hurting themselves who are placed in the padded cell.  He admitted that in his experience, the nurses usually only ask for the door of the padded cell to be opened when there is an emergency, and in the 16 years he had worked there, nursing staff had only asked for the door to be opened five or six times.  But when Gastineau spoke with Farnsworth around 10:40 a.m., telling him Danial had not moved since she began her shift and a nurse wanted the cell door opened to check Danial's vital signs, Farnsworth said he did not have any officers available. Farnsworth even admitted that the possibility Danial was having a medical emergency entered his mind.  [Doc. 402, p. 100.]  But Farnsworth never saw to it that the door was opened.

Based on the foregoing, the jury could reasonably conclude Farnsworth knew Danial was at substantial risk of harm.  He knew Danial was in the padded cell, where inmates who are at risk of hurting themselves are put.  The jury could also reasonably conclude Danial's need for medical attention was obvious, even to a lay-person.  Farnsworth was told Danial had not moved since the beginning of the shift and a nurse wanted the cell door opened to check his vital signs. Finally, the jury could reasonably conclude Farnsworth knew his conduct was inappropriate in light of that risk. Farnsworth admitted that the possibility Danial was having a medical emergency entered his mind, and he knew nursing staff only asked for the door to be opened to check no in inmate in case of emergency, but he did nothing to get the door opened so that Danial could receive medical attention.   The evidence at trial was in fact similar to the evidence

the Eighth Circuit held was sufficient, in Farnsworth's appeal of this Court's denial of qualified immunity, to deny qualified immunity. *See Letterman*, 789 F.3d at 863-64 (when Gastineau told Farnsworth that the nurse wanted the cell door open to check Danial's vital signs and Farnsworth failed to do so, a "jury could infer … that a person in Farnsworth's position would have recognized a substantial risk of harm to Danial, acted inappropriately in light of the risk, and recognized the impropriety of his response").

Farnsworth points to his testimony that after Gastineau called him, he radioed Gastineau back, heard her say "disregard," and assumed she meant he could disregard the call about opening Danial's cell door for a vitals check. Gastineau testified that her one-word remark to "disregard" concerned a separate phone call she had made about the staffing to cover the transfer of other inmates in the TCU. The jury was free to believe or disbelieve Farnsworth's testimony about what he thought Gastineau meant, and the Court does not consider credibility questions in deciding a motion for judgment as a matter of law; must view the evidence in the light most favorable to the verdict; and does not weigh the evidence. *Graham*, 792 F.3d at 955-56. Accordingly, Farnsworth's testimony does not change the analysis.

Farnsworth is not entitled to judgment as a matter of law.

### d.     Defendant Earls

Earls was a Corrections Officer III, or lieutenant, who was on duty on November 18, 2011, on the same shift as Gastineau, and was responsible for supervising the TCU, including the padded cell. Earls came through the TCU and received information about Danial's condition, but never opened Danial's door nor saw to it that the door was opened so that Danial could receive medical attention. Earls argues he did not know Danial needed help or was at serious risk of injury. He argues that although a nurse asked him to access the cell, "she did not tell him

she was concerned about [Danial], and [he] believed [the nurse] simply wanted to conduct a routine vitals check on a sleeping inmate." [Doc. 394, p. 12.] Earls resolves inferences in his favor, and overlooks evidence unfavorable to him. Viewing the evidence in accordance with *Graham*, 792 F.3d at 955-56, there was a legally sufficient evidentiary basis on which the jury could find for Plaintiffs.

Specifically, Earls came through the TCU on routine rounds the morning of November 18, 2011. Part of Earls' supervisory duties included checking on inmates in the padded cell, and Earls knew Danial had been moved to the padded cell the previous day, after engaging in self-harming behavior. Only the most at-risk inmates are placed in that cell. Earls viewed Danial on the video monitor at the TCU desk. Gastineau and Nurse Hook were standing there. Hook asked Earls if he was there to open Danial's door. Gastineau told Earls she needed to open Danial's cell door, she had made several attempts to get a response from Danial without success, Danial had not moved at all, and Nurse Hook needed into the cell to check Danial's vital signs. Gastineau or Hook also told Earls they had unsuccessfully tried to get Farnsworth to open the door earlier in the day. As noted above, medical personnel only ask officers to open the padded cell on rare occasions, when there is a potential emergency. But Earls said, "Let sleeping dogs lie," and the cell door was not opened.

At the beginning of a shift the following week, after Danial's death, Earls approached Gastineau and questioned her about the conversation between her, himself, and Nurse Hook. Earls asked if Hook had said she "was okay with not accessing the cell door at [that] time." [Doc. 402, p. 92.] Gastineau wrote a memo, directing it to Earls' superior, noting what Earls had asked her about Hook, and then noting she did not remember Hook saying that. [*Id.*][3]

---

[3]     Hook was not called to testify at trial.

Earls signed written statements, under oath, as part of the Department of Corrections' and State Highway Patrol's separate investigations into Danial's death. In both statements, he said he had looked into Danial's cell while he was in the TCU, but continuous video recorded in the TCU showed Earls never did so.

Based on the foregoing, the jury could reasonably conclude Earls knew Danial was at substantial risk of harm. For example, he knew Danial had been placed in the padded cell after committing self-harming behavior and only the most at-risk inmates are placed there. The jury could also reasonably conclude Danial's need for medical attention was obvious, even to a lay-person. Earls was told Danial was unresponsive despite several attempts to rouse him, and had not moved at all since the beginning of the shift. Earls was told that a nurse wanted the cell door opened to check his vital signs. Finally, the jury could reasonably conclude Earls knew his conduct was inappropriate in light of that risk The evidence at trial was in fact similar to the evidence the Eighth Circuit held was sufficient, in Earls' appeal of this Court's denial of qualified immunity, to deny him qualified immunity. *See Letterman*, 789 F.3d at 863-64 (Earls knew that Danial had been engaged in self-harming behavior the day before, Danial could not be awakened and had not moved in roughly 12 hours, multiple unsuccessful attempts to get a response from Danial had been made, only the most at-risk inmates are placed in the padded cell, medical personnel rarely ask to get into the padded cell and only in cases of potential emergency, and Hook had asked him to open the door; a factfinder could infer Earls was aware of a substantial risk of serious harm, acted inappropriately in light of the risk, and recognized the inappropriateness of his complete failure to act).

Earls is not entitled to judgment as a matter of law.

## 2.     The wrongful death verdict

The Court ruled at trial that Defendants were not entitled to official immunity as a matter of law, so instructed the jury under a negligence standard with respect to the wrongful death claim, not the malice or bad faith standard requested by Defendants.   Defendants argue that because the duties they allegedly violated were discretionary, they were entitled to official immunity, and the Court erred in refusing to instruct the jury using a malice standard.

The Missouri Court of Appeals recently examined official immunity in the context of a motor vehicle accident caused by the chief of a fire department, who elected to speed while driving to respond to a call about a fire in a cattle trailer in the middle of the highway.  *Rhea v. Sapp,* 463 S.W.3d 370 (Mo. Ct. App. 2015).   The appellate court explained that official immunity "protects public employees from liability for alleged acts of negligence committed during the course of their official duties for the performance of discretionary acts." *Id.* at 375-76 (internal quotation and citations omitted).   Discretionary acts are protected, while ministerial ones are not.   "The function of official immunity is to protect individual government actors who, despite limited resources and imperfect information, must exercise judgment in the performance of their duties." *Id.* at 376 (internal quotation and citations omitted).   "Whether an act is discretionary is determined case by case, considering "(1) the nature of the public employee's duties; (2) the extent to which the act involves policymaking or exercise of professional judgment; and (3) the consequences of not applying official immunity." *Id.*  (internal quotation and citations omitted).   The public employee bears the burden of pleading and proving entitlement to the defense.  *Id.* (citation omitted).

A ministerial act, on the other hand, "is defined as an act that law directs the official to perform upon a given set of facts, independent of what the officer may think of the propriety or

impropriety of doing the act in a particular case." *Id.* (internal quotation and citation omitted).

The fire chief in *Rhea* was entitled to official immunity, the appellate court held, because he was acting in the course of his duties when he responded to the emergency, and exercised his discretion in determining the speed he could travel in response to the call. The general rule is that when police officers and other emergency responders are driving in non-emergency situations, they are not entitled to official immunity. *Id.* at 377 (citing *Davis v. Lambert—St. Louis Int'l Airport,* 193 S.W.3d 760, 765 (Mo. 2006) (en banc)). But,

> [W]hen an officer is responding to an emergency, … the officer exercises judgment and discretion and is entitled to official immunity. ... The rationale is that the officer in an emergency situation must use discretion regarding how fast he or she can safely drive in response to the call, the route he or she must take based on the amount of traffic, and the location of the problem. … Without official immunity, an officer may be overcautious and not act decisively. … We grant them immunity in order that they may act decisively, even though they might afterwards, by hindsight, be adjudged to have acted negligently. … However, in a non-emergency situation, the operation of a vehicle does not require a public official to exercise policymaking or the exercise of professional expertise or judgment.

*Id.* at 377-78 (internal quotations and citations omitted). In other words, although driving generally involves the exercise of skill and judgment, driving in a non-emergency situation does not involve the exercise of professional expertise or judgment that the official immunity doctrine is designed to protect.

In this case, Defendants are governed by the close observation policy, the very purpose of which is to limit officials' discretion. The policy requires an inmate to be checked at least four times an hour, to determine whether he does not or will not move, or is not breathing, and to call the control center if there is no evidence of those things. The policy ensures that medical care can promptly be provided to an inmate by medical personnel if it is necessary. Considering the

15

factors laid out in *Rhea,* Defendants were not entitled to official immunity. First, the nature of Defendants' duties under the policy is not medical, and they are not called upon by the policy to act as medical personnel, simply to notify the control center if an inmate does not or will not move, or is not breathing. Second, no policy-making or professional expertise on the part of Defendants is involved. And finally, the consequence of withholding immunity should not discourage prison officials from performing their duties. Instead, it should enforce the purpose behind the close observation policy, by ensuring that the problems of inmates who are on close observation, and thus at acute risk of some kind of harm, are promptly conveyed to the personnel who are equipped to deal with such problems, i.e., medical staff. *See also Rush v. Senior Citizens Nursing Home Dist. of Ray County,* 212 S.W.3d 155, 161 (Mo. Ct. App. 2006) (nurses who failed to follow doctor's orders regarding medication dosage were not entitled to official immunity); and *Geiger v. Bowersox,* 974 S.W.2d 513, 517 (Mo. Ct. App. 1998) (prison policy required nurse to maintain and administer inmates' medications, but prison nurse failed to follow policy, an inmate's prescription medication was substituted for floor wax, and the inmate ingested it; prison nurse's duties were ministerial, her actions did not involve policy making or exercise of professional judgment, and she therefore was not entitled to official immunity).

### 3. The award of $100,000 for Danial Letterman's pain and suffering

Defendants argue there was no evidence from which a reasonable jury could have found them responsible for any pain and suffering Letterman experienced after he fell and before he lost consciousness. They state Danial "lost consciousness within 15 minutes after he fell" [Doc. 394, p. 13]; that there is no evidence care could have been provided in the 15 minutes before he lost consciousness even in the best of circumstances; that it would have taken at least 45 minutes to assemble the team to open the cell door; and that he could not have experienced

Case 5:12-cv-06136-NKL   Document 408   Filed 01/13/16   Page 16 of 28

pain and suffering after he lost consciousness. Viewing the evidence in accordance with *Graham*, 792 F.3d at 955-56, there was a legally sufficient evidentiary basis on which the jury could base its award of damages for pain and suffering.

Danial fell twice, once at about 11:30 p.m. and a second time around 11:45 p.m. Dr. Mary Case, one of Plaintiffs' experts, testified that Danial was conscious after the first fall, and remained conscious after the second fall for a minimum of ten to 15 minutes. Dr. Case based that minimum period of consciousness on the fact that the video shows volitional movement by Danial for that length of time. [Doc. 403, p. 443.] Dr. Case explained there are various levels of consciousness: consciousness is demonstrated by volitional movement; light unconsciousness by physical response only to painful stimuli; and complete unconsciousness by compromise of the upper and lower portions of the brainstem resulting in cessation of breathing and death. She further explained that the mere fact Danial was lying on the floor and did not appear to be moving did not mean he was unconscious, because a person can lose motor skills and still be able to feel pain or discomfort.

Furthermore, Gastineau testified that when she kicked on Danial's door and banged it with a key, and called to him from a few feet away, she saw him move his head and flutter his eyes. Gastineau also testified that when she looked through the food port, she could see Danial's carotid artery pulsing in his neck, and that his chest was rising and falling. [Doc. 403, p. 159.] Dr. Simmons was in the TCU that same morning, and noted in a memo that when she knocked on the door, Danial grunted and moved his head a foot a little. Earls testified about what he understood Dr. Simmons to have observed.

Thus, the evidence supports that Danial was conscious, partially conscious, or in and out of consciousness at least as late as the morning after the fall, experiencing pain and suffering for

more than enough time to assemble a team to open the cell.[4]

Defendants argue in their reply suggestions that Dr. Case made an admission in her deposition, with which they confronted her on cross-examination at trial, to the effect that she did not believe Danial was conscious more than 20 minutes after the second fall. Dr. Case explained she gave her best estimate, based on what she could see. Defendants' cross-examination does not alter the analysis because, on a motion for judgment as a matter of law, the Court views the evidence in the light most favorable to the jury verdict; does not weigh or evaluate the evidence; and does not consider credibility questions. *Graham*, 792 F.3d at 955-56.

### B. Alternative motion for new trial

Defendants argue in the alternative that they are entitled to a new trial under Rules 50(b) and 59, because the jury was not properly instructed concerning the wrongful death claim. Defendants also argue that the Court should have allowed them to offer evidence of what other prison staff thought about Letterman's condition; Letterman's bad character and habits; and the Social Security Administration's posthumous grant of disability benefits to Letterman.

The key question in considering a motion for new trial is "whether a new trial is necessary to prevent a miscarriage of justice." *Graham*, 792 F.3d at 957 (internal quotation and citation omitted). A miscarriage of justice does not result any time there is an error at trial. *Buchholz v. Rockwell International Corp.*, 120 F.3d 146, 148 (8th Cir. 1997). The trial court

---

[4]     While there was in fact a legally sufficient evidentiary basis on which the jury could base its award of damages for pain and suffering, the Court notes that Defendants' own testimony is at odds with their argument that a minimum delay of 45 minutes for assembly of the team was likely to have occurred. Lammers and Earls both testified that they could and would have used their own keys to open the cell door immediately, without waiting for a team, had they thought Danial was in trouble. [Doc. 402, pp. 178-79; Doc. 403, p. 534.] In other words, Defendants' argument that there was not enough time to muster a team to open the door arguably also fails based on Lammers' and Earls' admission that almost no time would have been needed to open the door.

18

"must determine whether the alleged error affected the substantial rights of any party sufficient to warrant a new trial[.]" *Pointer v. DART,* 417 F.3d 819, 822 (8th Cir. 2005).

### 1.    The jury instruction regarding the wrongful death claim

Defendants argue that a new trial is warranted on the wrongful death claim because the Court instructed the jury under a negligence theory, even though Defendants were entitled to official immunity.

The "failure to give a proposed instruction must result in prejudice to the requesting party before a new trial will be ordered." *Graham*, 792 F.3d at 958 (quoting *Cox v. Dubuque Bank & Trust Co.,* 163 F.3d 492, 497 (8th Cir. 1998)). The trial court abuses its discretion only when the omitted instruction: "(1) correctly state[s] the applicable law; (2) address[es] matters not adequately covered by the charge; and (3) involve[s] a point 'so important that failure to give the instruction seriously impaired the party's ability to present an effective case.'" *Id.* (quoting *Cox,* 163 F.3d at 496). *See also Safety Nat. Cas. Corp. v. Austin Resolutions, Inc.,* 639 F.3d 498, 501 (8th Cir. 2011) (review of the denial of a proposed jury instruction is for abuse of discretion).

The Court has already rejected, as a matter of law, Defendants' claim of entitlement to official immunity. Therefore, the jury instruction that was given, based on negligence, correctly stated the law and Defendants' proposed jury instruction, based on a malice standard, did not.

### 2.    Evidence of what other prison staff thought about Letterman's condition

The Court granted Plaintiffs' pre-trial motion in limine to exclude evidence of wrongdoing or policy violations by medical personnel, but further ruled: "Defendants may argue they relied on the assessments and judgment of the medical staff, and that if staff did not recognize the seriousness of Danial's circumstances, then it is neither reasonable nor credible to infer that the Defendants recognized there was a problem, to the extent that the evidence supports

the Defendant was aware of the assessment and judgment." [Doc. 316; Doc. 335, pp. 2-3.] Defendants argue they are entitled to a new trial because evidence of healthcare staff's lack of concern, even if not communicated, was relevant to show Danial's "serious medical needs were not obvious even to trained professionals." [Doc. 394, p. 17.] Defendants also argue that such evidence is "circumstantial evidence" that "would corroborate an account of a conversation that actually occurred between that third party and an individual defendant." [Doc. 405, p. 10.]

When a movant seeks a new trial based on an allegedly erroneous evidentiary ruling, the movant must show the error affected his substantial rights and that a new trial would likely produce a different result. *Graham*, 792 F.3d at 957 (citation omitted). Denial of a motion for new trial based on evidentiary rulings "will not be reversed absent a clear and prejudicial abuse of discretion." *EFCO Corp. v. Symons Corp.*, 219 F.3d 734, 739 (8th Cir. 2000). Defendants have failed to show any error affecting their substantial rights and that a new trial would likely produce a different result.

First, the evidence of health care staff's thoughts was appropriately excluded in view of the Eighth Circuit's decision affirming this Court's rejection of Farnsworth's and Earls' claim of entitlement to qualified immunity. The Eighth Circuit expressly addressed what should and should not be considered in evaluating the deliberate indifference element of Plaintiffs' claim:

> When evaluating whether an actor deliberately disregarded a risk, we consider his actions in light of the information he possessed at the time, the practical limitations of his position and alternative courses of action that would have been apparent to an official in that position. …

*Letterman*, 789 F.3d at 862 (internal quotations and citations omitted) . Thus, the Eighth Circuit continued in its discussion of Farnsworth's' argument, the focus is placed

> [O]n the mind of the prison official and the information at his disposal, not the thoughts of third-party actors who do not disclose

20

> their thoughts. ... Here, Farnsworth heard only that a nurse wanted
> the door open to take Danial's vitals. Even assuming Nurse Hook
> was not concerned about Danial, there is no evidence that
> Farnsworth was aware of this lack of concern or relied on it when
> Farnsworth decided to take no action.

*Id.* (internal citations omitted) . With respect to Earls, the Eighth Circuit similarly stated:

> Also like Farnsworth, the issue is simply whether Earls had
> knowledge of the substantial risk of serious harm to Danial such
> that his inaction would be considered deliberate indifference.

*Id.* (internal citations omitted).

At trial, Defendants were permitted to and did introduce evidence of what health care staff said to them directly, and what health care staff said to others that became known to the Defendants. Defendants also testified about how their own impressions were affected by what health care staff said and did. But Defendants were not permitted to introduce evidence of what health care staff thought, to the extent that Defendants did not actually know of and rely on such information. The exclusion of the undisclosed thoughts of health care staff was consistent with the Eighth Circuit's decision in *Letterman.*

Second, although Defendants argue that the excluded testimony would have corroborated what they testified to, it was cumulative evidence. In view of Defendants' ability to testify about what the health care staff said to them directly, and what was indirectly made known to Defendants, the Court concludes that excluding the undisclosed thoughts of health care staff was not prejudicial. *S.E.C. v. Shanahan*, 646 F.3d 536, 548 (8th Cir. 2011) (holding that where excluded evidence would have been cumulative to other admitted evidence, any abuse of discretion in excluding such evidence is not prejudicial).

Defendants also argue that the medical staff's lack of concern, even if not communicated, was relevant to show Danial's "serious medical needs were not obvious even to trained

professionals." [Doc. 394, p. 17.]  First, the relevant inquiry is whether the medical need was obvious to a lay person, not medical professionals. But even if this evidence may have been marginally relevant (i.e. if a medical person would not recognize the medical need how could a lay person), the admission of this evidence would have opened the door to testimony about whether a competent nurse or doctor would have recognized that Danial had a serious medical need and a mini trial on whether the medical personnel had the same information that the Defendants had.   This in turn would likely lead to juror confusion.  Indeed, Defendants moved for exclusion of testimony by Plaintiffs' expert, Dr. Case, that Danial's condition would have been obvious even to a lay person.  The Court excluded this evidence but would have ruled otherwise if the implicit opinion of the prison medical staff on the obviousness of the medical need were admitted.   Finally, the jury knew that prison medical staff did not, at least initially, take any steps to examine Danial.  It is therefore unlikely that the outcome of the trial would have been different if the involved medical personnel were able to say that they did not see an obvious need for medical attention.  [Doc. 314; Doc. 335, p. 4.]

Finally, Defendants rely on *Krout* and *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038 (8th Cir. 2006), to argue that corrections officials may rely on the assessment of medical staff to avoid liability on a claim of deliberate indifference.   In the *Letterman* appeal, the Eighth Circuit distinguished *Krout,* noting that the prison official was informed by the medical personnel that the inmate did not need medical attention and the official relied on that information.  789 F.3d at 863 (citing *Krout*, 583 F.3d at 568-69).   *Drake*, another deliberate indifference case, is similar.  There, the Eighth Circuit concluded that the jail officials' decisions were not unreasonable, "in light of the risks as the jailers understood them at the time. The jailers' view of the risk was shaped by the discharge summary and recommendations of [medical personnel], who did not

indicate that [the prisoner] was suicidal, instead calling his behavior manipulative. In light of those opinions and recommendations, the actions by the jailers, even taken in the light most favorable to [the prisoner], did not constitute deliberate indifference." 445 F.3d at 1042-43. At core, whether prison officials may rely on medical personnel's assessment of risk depends on whether the officials knew of and relied on that assessment. And here, Defendants could not have relied on the assessments of medical personnel that were not known to them.

Defendants are not entitled to a new trial based on exclusion of the evidence of what health care staff thought, but did not disclose, to Defendants.

### 3. Evidence of Letterman's bad character and habits

Defendants argue they are entitled to a new trial because the Court excluded evidence showing Danial's "bad character and habits": the testimony of Danial's ex-wife that he was a regular narcotic drug user in the years and months before he died; swastikas and other tattoos (such as "Fuck the World" and "Hated 4 Life") on his body that "evinced social maladjustment"; and that he gave up his parental rights to his first-born daughter, H.M., in exchange for being forgiven approximately $5,000 in overdue child support. [Doc. 394, p. 18.] Defendants argue that such evidence was "broadly relevant to the damages Plaintiffs claimed on their own behalf and on behalf of" Danial, including rebuttal of the presumption under Mo. Rev. Stat. § 537.090 concerning the value of care Danial would have provided his daughter. [*Id.*]

Federal Rule of Evidence 403 provides a court discretion to exclude relevant evidence "if its probative value is substantially outweighed by a danger of ... unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." A court's discretion to exclude evidence is very broad. *Pittman v. Frazer,* 129 F.3d 983, 989 (8th Cir. 1997) ("Rulings on admissibility of evidence will not be reversed absent a

clear and prejudicial abuse of discretion."); *Adams v. Fuqua Indus., Inc.,* 820 F.2d 271, 273 (8th Cir. 1987) (discretion to exclude is abused only "[w]here the district court excludes evidence of a critical nature, so that there is no reasonable assurance that the jury would have reached the same conclusion had the evidence been admitted").

The evidence concerning Danial's drug abuse would, at minimum, have been cumulative. The jury in fact heard that Danial had a felony conviction; had used drugs; had a drug addiction; had mental health problems; went to jail on drug charges; violated his probation by using drugs; and tested positive for drugs on urinalysis. The Court cannot conclude the jury would have reached a different conclusion had it also heard the testimony of Danial's ex-wife that he was a regular narcotic drug user in the years and months before he died.

The evidence of Danial's tattoos "evince[ing] social maladjustment" would have been unfairly prejudicial, and are not, in any event, relevant. "Evidence is unfairly prejudicial in the Rule 403 sense … when it would influence the jury to decide the case on an improper basis." *Cummings v. Malone*, 995 F.2d 817, 824 (8th Cir. 1993) (citing Fed. R. Evid. 403 advisory committee's note ("Unfair prejudice ... means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.")). Courts routinely exclude evidence of tattoos, on the basis of danger of unfair prejudice, among other reasons. *See, e.g., Henderson v. City of Houston*, 273 F.3d 1108 (5th Cir. 2001) (Title VII, race discrimination case; evidence of tattoo of confederate flag not admissible to show racial animus); *U.S. v. Irvin,* 87 F.3d 860, 865 (7th Cir. 1996) (prosecution for drug trafficking; admission of evidence of tattoo showing membership in a gang was unfairly prejudicial). Here, evidence of Danial's tattoos including images of swastikas and a phrase containing a vulgarity could lead a jury to decide the case on an emotional basis, particularly when there is no other information

Case 5:12-cv-06136-NKL   Document 408   Filed 01/13/16   Page 24 of 28

concerning when or why he got them, nor how he displayed them.  Further, the tattoos have no relevance to why Danial died, or to the damages awarded for his injuries on the civil rights claim.  At best, any probative value is substantially outweighed by the danger of unfair prejudice such evidence may have caused.

Evidence that Danial allegedly gave up parental rights to his first-born daughter, H.M., in exchange for being forgiven $5,000 in past due child support owed to Erin Steen is not relevant. H.M. was adopted and therefore was not entitled to share in damages for Danial's wrongful death.  *See Baggett ex rel. Baggett v. Flinn,* 220 S.W.3d 334, 335 (Mo. Ct. App. 2007).  Further, any probative value of such evidence with respect to the damages award is outweighed by the potential to mislead the jury.  The relationship Danial had with one child who was not damaged by Danial's death, is not relevant to how his other child was damaged.

In any event, the jury heard evidence that Danial lived with his parents, and that they supported him financially, as well as the evidence, noted above, concerning Danial's problems relating to drugs.  The Court cannot conclude Defendants would successfully have rebutted the statutory presumption under § 537.090, nor that the jury would have reached a different conclusion concerning damages, had the jury additionally heard Danial allegedly gave up parental rights to another child in exchange for being forgiven $5,000 in past due child support.

Defendants are not entitled to a new trial based on exclusion of evidence identified by Defendants of Danial's "bad character and habits."

4.      **Evidence of the Social Security Administration's posthumous grant of disability benefits to Letterman**

Finally, Defendants argue they are entitled to a new trial because the Court did not permit them to introduce evidence that the Social Security Administration posthumously granted Danial disability benefits.  They state that had "such evidence been admitted, Defendants would have

25

been able to persuasively argue that [Danial's] confirmed mental health disability would have impaired his ability to care for his daughter."  [Doc. 394, p. 19.]  They further state in their reply suggestions that Plaintiffs' economist conceded, in deposition, that records showing Danial had a mental disability would be relevant to the value of care Danial could have provided his daughter. [Doc. 405, p. 19, citing Doc. 321, p. 13.]

Defendants cite no authority providing that a determination of disability for purposes of receiving Social Security benefits means a parent cannot successfully care for his child or that the value of his services is thereby reduced, nor is the Court aware of any such authority. Generally, evidence of an award of disability benefits is excluded by courts on the basis that it is highly prejudicial.  *See* MICHAEL H. GRAHAM, 2 HANDBOOK OF FEDERAL EVIDENCE § 403:1 (7th ed.) (and cases cited therein).  For example, in *Robinson v. All-Star Delivery, Inc*., 992 P.2d 969, 975–76 (Utah 1999), the court held such evidence was properly excluded because any probative value would be outweighed by the risk that evidence of the award could cause a jury to view the recipient as a "bad man," "poor provider," or "worthless individual."  In *Green v. Denver & Rio Grande Western R. Co.,* 59 F.3d 1029, 1033-34 (10th Cir. 1995), the court held  it was reversible error for the trial court to have allowed evidence of disability benefits because juries might "be more likely to find no liability if they know that plaintiff has received some compensation."

The court in *Villanueva v. Zimmer* held that evidence of a Social Security disability determination "adds nothing to the jury's deliberation, other than the conclusion of another fact finder arrived at through a process similar to the one that the trial is undergoing.'"  69 A.3d 131, 143 (N.J. Super Ct. App. Div. 2013) (citing STEVEN P. GROSSMAN & STEPHEN J. SHAPIRO, THE ADMISSION OF GOVERNMENT FACT FINDINGS UNDER FEDERAL RULE OF EVIDENCE 803(8)(C):

LIMITING THE DANGERS OF UNRELIABLE HEARSAY, 38 U. KAN. L. REV. 767, 777 (1990)). Thus, the *Villanueva* court concluded, the SSA's determination that the plaintiff became disabled on the date of the accident was properly excluded as prejudicial and likely to mislead the jury into supposing it could rely on that determination. *Id.*

Likewise here, the admission of evidence of a posthumous finding of disability would have been highly prejudicial, and likely to mislead the jury, whether into thinking Danial was a bad person or poor provider; that the disability award was adequate compensation; or that they could somehow rely on that determination of disability.

Furthermore, if Plaintiffs' economist conceded in deposition that records showing Danial had a mental disability would be relevant to the value of care Danial could have provided his daughter[5], the SSA's posthumous determination was not the only means Defendants had of confronting the expert with evidence of Danial's mental problems, inasmuch as Defendants had access to Danial's treatment records and were permitted to present some evidence from them. Defendants were not prejudiced by the exclusion of evidence of the SSA determination at trial. Finally, there was already evidence that Danial relied on his parents for financial assistance, so further evidence that he had limited earning capacity is unlikely to have changed the jury's verdict.

Defendants are not entitled to a new trial based on exclusion of the evidence of the SSA's posthumous disability determination.

---

[5]      Defendants did not include the economist's deposition testimony with their motion for judgment as a matter of law or new trial, nor with their motion in limine.

**III.    Conclusion**

Defendants Lammers, Gastineau, Earls, and Farnsworth's renewed motion for judgment

as a matter of law, or in the alternative, motion for new trial [Doc. 394] is denied.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  January 13, 2016
Jefferson City, Missouri